et al. Counselor, would you proceed? Ms. Mitchell for Ameren and Mr. Funk for Commerce Comm'n? Yes, sir. All right, thank you. Again, when you begin, if you would please state your name again for the recording, for the record. Thank you. Thank you. Thank you. Thank you. May I proceed? May it please the Court. Good morning, Your Honors. My name is Ann Mitchell, and I represent Ameren, Illinois. Early in 2023, Ameren, Illinois, filed a request with the Illinois Commerce Commission seeking to increase the rates that it charges to customers to deliver natural gas to their homes and businesses here in Illinois. Ameren has more than 800,000 customers on both the residential and the business side. Ameren, Illinois' rates are intended to recover the utility's operating costs plus a reasonable return on the rate base, which is generally referred to as the revenue requirement. The revenue requirement at issue in the case below was for the test year 2024, a calendar year 2024. In the case below, the Commission went beyond the authority provided in Article 9 of the Public Utilities Act, which relates to rate setting, and reached certain outcomes that it had predetermined. And it was its conclusions driven by those outcomes that are on appeal before this Court. And in order to reach certain of those outcomes, the Commission had to reach beyond the authority that's delegated to it as a legislative body by the General Assembly. There are at least three examples in the order below where the Commission reached beyond its authority. The first was the Commission's imposition on Ameren, Illinois, to require the company to file a long-term infrastructure plan for its gas infrastructure beginning July 1, 2025. That reporting requirement is not supported by the Public Utilities Act, and the Commission imposed that requirement without the notice and comments procedures provided for by the Administrative Procedure Act. Second, the Commission ignored the general prudent standard long applied in rate-setting cases and adopted blanket adjustments to deny Ameren, Illinois, cost recovery of more than $90 million of investments in pipelines that were driven by safety and reliability. Third, the Commission inserted itself in the witness box as an expert to derive its own return on equity amount, which is the profit component of a utilities business. This is where the utility gets its money. Turning first to the long-term infrastructure plan, as I mentioned, the case below was a rate case under Article 9 of the Public Utilities Act. In a rate case, the Commission is to determine whether a rate increase or decrease, as the case may be, is supported by the evidence presented in the case. And it's a rate increase or decrease as of that point in time. Again, here is for the test year 2024. But the Commission decided that it would impose a requirement on Ameren, Illinois, to provide a long-term gas infrastructure plan that, according to the Commission, would aid the Commission in future rate cases, which, of course, were not at issue before the Commission in the case below. There is nothing in the Public Utilities Act that speaks to such infrastructure planning filing requirements for gas utilities. The legislature did adopt such requirements for electric utilities in the Climate and Equitable Jobs Act that became law in 2021. But there is nothing in that law or anywhere else in the Public Utilities Act that speaks to the requirement to file long-term infrastructure plans for gas utilities. Let me interrupt you and stop you there. Don't they have, and I'm not sure if I recall the exact wording, but don't they have the ability to carry out, through any reasonable means, the goals in order to determine rates? Meaning, in order for Ameren to decide what, I'm sorry, the Commission to decide what steps Ameren was taking and if they were prudent in terms of their capital improvement or safety in that, wouldn't a long-term plan help facilitate that? Which then would relate back to rates, correct? What the Commission decided was that that future plan filing would impact future rate cases. But because the Commission ordered that the first plan be provided by July 1, 2025, it could not have impacted the Commission's decisions on the rates that were at issue for 2024. Instead, the Commission had to look at the evidence that was presented in the case below as to that test year 2024 and not what might come in a future plan or hypothetical future cases. And the Commission does point to a number of provisions of the Public Utilities Act. In the decision below, they cited Section 8501 as providing plenary power to address the rate case. But we submit that 8501 does not apply here. 8501 is found in Article 8 of the Public Utilities Act, which relates to service obligations of the utility. 8501 requires that a case be initiated by a motion or a complaint alleging in some fashion that the utility's service is in some way deficient. There were no such allegations here. There's no allegation that Ameren, Illinois is not providing service to its customers in a deficient way. So 8501 does not provide the authority. For the first time in its brief before this Court, the Commission also relies on Section 5101 of the Public Utilities Act. Again, not cited by the Commission in the order below. And that provision just says that the books and records of the company are available to the Commission for review. But again, those are books and records that are in the company's possession, not the generation of new material at the direction of the Commission. As I said, those provisions of the Public Utilities Act don't provide the support for the Commission's determination to impose this filing requirement. There also is an issue insofar as the filing requirement is an administrative rule. And therefore, the Administrative Procedure Act applies. And under 170 of that Act, an administrative rule is something that is an agency statement of general applicability that implements, applies, interprets, or prescribes law or policy. And here, the Commission said, we are making it a policy of the State of Illinois to require gas utilities like Ameren to make these filings going forward and presumably in perpetuity. The Commission made that same finding for Ameren, Illinois. The Commission made the same finding in two other decisions that were issued on the same day, November 16, 2023, impacting the largest gas utilities in Illinois. They were identical filing requirements, and they set forth the Commission's policy. However, the Commission did not follow its own, excuse me, the notice and comment requirements of the Administrative Procedure Act. And a failure to follow those requirements for purposes of adopting a rule renders that rule void. Next, I'll turn to the capital investment in the company's pipeline system. As I mentioned, Ameren, Illinois, has more than 800,000 natural gas customers in the State of Illinois. It requires a system of more than 18,000 miles of pipe to bring natural gas to those homes and businesses. That pipeline, much of it is older pipeline. There's evidence in the record that Ameren has a great deal of older steel pipeline installed in the 60s that has been demonstrated to have a tendency to leak. And so Ameren has implemented a systemic approach to analyzing, assessing, and replacing where necessary those pipelines. The types of pipelines are both distribution, which is your smaller diameter pipeline that brings the gas directly to customers, as well as transmission pipeline, which is larger diameter, higher pressure pipeline that typically is interconnected with the source of the gas, like an interstate pipeline. Both types of investments were at issue here. And the commission effectively said to Ameren, we want you to put the brakes on these investments. We are looking at what you're proposing to spend. And even though it's the same kinds of investments, Ameren, that you've been making for years, and even though it's the same kind of pipe that has been at issue before in rate cases, we are saying now we want you to tap the brakes, curtail, slow down the pace of investment. And they did so by adopting blanket adjustments associated with those two types of investments, 33% for distribution investments in 2023 and 2024, and a 75% adjustment for 2024 transmission investments. And the problem for the commission is that at the beginning of this discussion of the capital investments, the commission recognized that a general prudence standard applies. But the commission did not actually apply the general prudence standard. The general prudence standard, as adopted by the commission for decades and recognized by this court, including in the Illinois power case 339, ill at third, 425, at 428. Prudence is the standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made. And this court also recognized that under prudence, reasonable persons can have honest differences of opinion without one opinion being imprudent. And here the company provided evidence that supported the prudence of its investments in these distribution and transmission pipelines. The company submitted testimony from its engineering experts. There was also testimony from the staff of the commission, their own engineering expert, testifying to the prudency of these investments. Is there anything, or where on the record, or is there anything on the record that addressed the risk associated with a pipeline due to the maximum allowable operating pressure, either in the pipeline that's already confirmed or a pipeline that was disallowed? There is evidence in the record of that requirement from the federal agency, the Pipeline and Hazardous Materials Safety Administration. They adopted that maximum allowable operating pressure rule in 2019. And there's, as to the transmission investments, that it is the transmission pipeline that's at issue for purposes of that rule. And in the company's Schedule F-4, which is AMRIN Exhibit 6.1 revised, it's found in the appendix to our brief that the company addressed the five transmission projects that were subject to that rule. So the company went through the analysis for each of those projects, saying that each of those five pipeline projects were necessitated by that MAOP rule. Was the sole reason for the commission's disallowance the AG's request to slow down the process, or was there some other reason they gave? The AG's request to slow down is the only thing that's in the record. Thank you. And as to, that's the primary basis for the transmission investments. The distribution investments were supported also by pipeline safety guidance around mechanically coupled steel facilities. And mechanically coupled steel is a nature of construction where two types of pipe are held together by a mechanical coupling. It's a joining point in pipeline construction and is a system of joining that is no longer used. It's no longer best practice because it does have a tendency to leak. And so AMRIN was and still is pursuing investments in that type of pipeline to remove it from its system. Given the risks that you said the engineering testified about, was there any guidance given from the AG or the commission as to what they consider to be a prudent timeline? With respect to transmission or distribution? Yes. I believe the commission acknowledged that the PHMSA standard has an absolute timeline by which all eligible pipeline must be reconfirmed for purposes of MAOP. They acknowledged that there's also evidence that AMRIN was well on its way to achieving 100% compliance, but it was not there yet. And effectively the commission said, you have more time. You can do it within the timeframe provided by the PHMSA rule, and you don't need to do all of what you're proposing in 2024, which is the year at issue. The long-term debt rate that was addressed by the commission, AMRIN had already taken out loans of 4.95%. Was that evidence of that debt submitted to the commission? There was testimony from an AMRIN witness that the $500 million had been priced, and there was reference to the separate docket. There was a separate request to the commission to allow AMRIN to take on that debt. That was a separate docket that was referenced in the rate case. Turning to the return on equity, the commission set that at 9.44%. I may have the numbers mixed up here. That's right. AMRIN asked for a different amount, and the commission rejected that because it was using a model that they disapproved. Had that model ever been approved by the commission before? Well, the recommendation of AMRIN's expert witness relied on several models. The model that the commission rejected was not actually the basis of the witness's recommendation. What he testified to was that he referenced the source of that model as validation, but that it didn't form the basis of his recommendation. If I may, I see my time is up, but I'll finish this point. The problem with the commission's outcome is that it rejected essentially all of the expert recommendations. A return on equity is determined based on financial experts who come in to rate cases, and it's been done that way for years. In this instance, the commission rejected essentially every recommendation of those experts and came up with its own number. It seemed to me like in some instances staff, I'm not sure if staff of the commission, but staff made one recommendation, AMRIN made another recommendation, there were some outside parties who made other recommendations. It seemed at times like the commission took an average of some of those. Is that accurate or is that unacceptable? The commission historically has, in the last decade or so, taken averages of the experts' recommendations. In this case, what the commission did was they rejected all of AMRIN's, rejected the entirety of AMRIN's expert recommendation, rejected the entirety of that third recommendation on behalf of interveners. That was by Mr. Walters. The commission said we're not relying on any of the analysis done by these two parties. We'll look to some of what the commission staff did. That was Ms. Kite-Garlish. But they weren't even willing to accept what Ms. Kite-Garlish had put forward because they had to modify her analysis in order to arrive at a number that was below her actual recommendation to the commission. So their number was actually lower than staff's recommendation. That's right. Correct. And then, if I could jump ahead, that was the case as well, and I don't want to mistake this, in terms of the low-income program, the rider. It was my understanding that AMRIN had a tiered system that they put forward and that staff had a tiered system that they put forward, but that the commission adopted a completely different tiered system. Is that correct? That's right. There were competing recommendations around different structures for that low-income proposal. AMRIN's proposal just looked at an eligible population that would have roughly mirrored those that are eligible for low-income heat energy assistance under the state and federal rules that provide for such assistance in the normal course. AMRIN essentially said the same type of customers would be eligible, and the commission and the staff was generally in alignment as far as the eligibility, and the commission's tariff that it ultimately adopted was a much more expansive group of eligible customers, as well as a larger percentage of credit to be available to those eligible customers. So I think what I'm getting at is, is it common for the commission to adopt recommendations or to adopt standards outside of recommendations from staff experts or staff? I don't know how common it is. I would say historically the commission is guided by the recommendations, the expert testimony that's in the record. I mean, the commission's decisions must be supported by record evidence. So to the extent the commission comes up with something on its own that isn't in the record evidence, that would be improper. We recognize that the commission has technical expertise, but that's to judge what's in the evidence, not to make up its own analysis or to drive an outcome for some policy reason that isn't supported in the law or in the evidence. What are the costs to AMRIN in being required to adopt this low-income, what are you going to call it, subsidy plan to have low-income customers' bills assisted? There are administrative costs to reprogram computer systems to allow those credits to be applied. Those administrative costs generally are recovered from customers. So it's a revenue-neutral issue insofar as AMRIN should receive cost recovery for its efforts to implement the program. But there are impacts for other customers, the non-eligible customers, as well as customers that fall into the different tiers and may or may not be eligible for the same amounts as similarly situated customers. So the payment plan is essentially different for different customers. And it's a burden-shifting payment. I'm sorry. I'm not stating that correctly. The payments are shifted then from one class of customer to another class. Would that be accurate? Yes. To the extent that all – there is a population of residential customers that is eligible to receive a credit under this tariff. Commercial customers, the larger industrial customers, manufacturing, they are not eligible, but they will pay for the credits that are given to residential customers. And that credit – excuse me – that credit amount will grow under the commission's adopted approach as compared to the approach AMRIN Illinois presented, which is a more moderated approach and would have resulted in less cost to the non-eligible customers, whether they be your business customers or your residential customers that don't fall into the particular brackets of eligibility. How often are they verified or determined to be eligible? That – I believe I'd have to look at the record to confirm, but I believe that there is a process for confirming eligibility on an annual basis. There's certainly the LIHEAP system in Illinois has an annual recertification, and I believe that there are measures in place to require sort of a recertification of eligibility. But I can look at that and confirm when I am back before you. And how are they verified? How is that? There is a piggybacking, if you will, on some of the eligibility that the state agencies – there are community agencies that work with customers already to verify eligibility for LIHEAP, and there is some leveraging of that to be done. Basically, where a customer has been certified as eligible to receive LIHEAP, they would also be eligible for the low-income credit. But there is a bracket of the expanded approach adopted by the commission that relies on self-certification, and there's supposed to be some auditing of that category of customer so that there is an assurance that those customers are actually eligible. Thank you. Questions? Other questions? Thank you. We'll give you a chance for rebuttal momentarily. Mr. Funk, are you ready to proceed?  May it please the Court, Counsel. Good morning, Your Honors. My name is Robert Funk. I represent the Illinois Commerce Commission. Your Honors, I do intend to address two primary issues this morning with respect to the return on equity and also the proposed plant additions. But I want to briefly just touch on a couple of matters that Your Honors have questions on. With respect to the right or like, I think it's important for the Court to understand that there were a total of four different proposals. Ammon was at the low end. The Attorney General was at the high end. And the PIO, public interest organizations, and the AG were, or excuse me, and staff were in the middle. They all had varying proposals. Ammon's was the cheapest. It helped the fewest number of people. The AG's was the most expensive. It helped the most people. And to Your Honors' question, yes, that cost will be socialized, excuse me, amongst other rate-paying customers of Ammon. But the Commission's determination on that issue wasn't discriminatory, as Ammon alleges. It was simply a choice to help more people, as suggested by the General Assembly, when it called for the low-income report that kind of initiated this process. And then thereafter, and following the stakeholder process that led to the report that was submitted to the General Assembly, and then the evidence that was received in this contested case. Was there a public hearing held on the issue of cost shifting or having some customers pay more to offset other customers not paying as much? Your Honor, I know that there was what they referred to as a stakeholder meeting, which would have been a public meeting where everybody could have come and talked. Certainly at that time, it was very preliminary. I don't think that there had been any establishment of what the cost would be for the program or what the amount of the discounts would be. But certainly, I believe it was a wide-ranging discussion or scope of topics as to what was going to happen. It was a fact-finding mission. That was why they had the stakeholder meeting. They wanted to hear ideas and concepts for how to structure this low-income rider. So the Commission does have authority, then, to require some better-off customers to subsidize the bills?  The Public Utilities Act was specifically amended to allow for both the stakeholder process, called for the report to be submitted to the General Assembly, and then following that report within the Commission's discretion, it had the authority to approve these types of low-income riders. Yes, Your Honor. And just so I'm clear, the Commission adopted the AG's proposal, or it was a modified form of the AG's proposal? I believe it was the AG's proposal, Your Honor. I could be mistaken. There's a lot of discussion on that in the Commission's work. But I believe it was the AG's proposal. And that would have been, the record would reflect that, correct? Yes, correct, Your Honor. I'm tempted to ask you, this record's over 24,000 pages, I'm tempted to ask you what page that's on. I guess we won't do that. I appreciate Your Honor not asking that. I can direct Your Honor to the order, if you prefer. Go ahead and jump to your other issues. Okay, time's limited, so let's jump to that. With respect to the ROE, the counsel said that the model that was rejected, that the Ammon's Witnesses model that was rejected by the Commission did not form the basis of his opinion. That's wrong. It did. All of the models that Ammon's Witnesses utilized formed the basis of his opinion. And that's the same with all the other witnesses. But what about that notion that's been argued or espoused, that the Commission essentially took different pieces of each model and created their own model? I mean, can you address that? It's not quite accurate, but I can address that, Your Honor. ROEs are derived in all the past decisions by the Commission through the use of various financial models. Two models have been routinely accepted by the Commission, the DCF model and the CAPM model. Ammon's Witnesses used those models, but also at least two others, in variance of the two others, to come up with a multitude of these various, a range of ROEs. And I think it's important for the Court to recognize, and I'm going to answer your question, but to understand the range. At the low end, we have about 8% ROE based on one of the models by one of the witnesses. And at the high end, we have 13, almost 13 or 11, three quarters, excuse me. So there's this huge range, right? And then each of those witnesses, based on their various financial models, would have three or four outcomes, and then they would average those and come up with an overall ROE. The Commission's ROE of 9.44% is very much in the middle of that range. Although, to Your Honor's question, to Ammon's counsel, it wasn't below the lowest of their overall averages, if that makes sense. And I'm trying to understand. So each of the experts gave different averages, or different multiples. Multiple estimates, I would guess. Multiple estimates. All right. And ultimately, what the Commission decided was at the lowest end. Is that accurate? No. So each witness had multiple estimates and had ranges. The lowest of those low was like 8.08%. The highest was 11, three quarters. And so, let me explain it this way. So essentially, it was about an average of the highest of the lowest. It was certainly well within the middle. And what the Commission did here is that it looked at the financial models. Some of the models had been previously rejected in many other cases. It also looked at the inputs that the witnesses used as part of those models. And that caused the balance of the estimates to be rejected. Because the Commission had rejected. It's like, do you use a historical stock price or do you use a spot stock price? Do you use an average or a spot stock? And the Commission, in prior decisions, had gone through all this analysis. And Amron's witness chose, notwithstanding all this past precedent, notwithstanding the fact that he acknowledged that he knew the Commission had rejected these in past decisions, he went ahead and used them anyway. And I think it's really important for the Court to understand that Amron is not before you arguing that the Commission erred in rejecting any of those inputs or the financial models by Amron's witness or the other witness from IFCOP. What the Commission ultimately did after analyzing all of the estimates was found that Staff's DCF estimate was scrutiny. But you've heard a lot of talk about averaging. And that has happened in the past. It's a way... They basically averaged the DCF and the CAPM models. They averaged those two and came up with 9.44. Correct. And Amron's critical of the fact that the Commission modified Staff's CAPM because it found that one of the inputs from the IFCOP witness was more reasonable and based on more reliable evidence. And so it substituted that input in Staff's CAPM, came up with the two numbers, and actually by doing so increased... Staff's DCF was 9.4. Staff's modified CAPM was 9.47. So it actually raised the average. So to the extent that Amron's talking about preordained results, the Commission went through an awful lot of effort to raise Amron's ROE. I'm running out of time. Can you jump to the required detailed gas infrastructure plans where she was talking about that's only been required for electric distribution, not for gas? How does gas even get involved here if the legislature didn't include that? The legislature did what it did with respect to the electric utilities in CJEA. There's a whole lot of other reasons why and what's going on on the electric side of utility regulation. But with respect to Amron in this case, the driver that caused the Commission to ask for this long-term plan was that it found that Amron's transmission planning lacked transparency. It couldn't get, and that's really the basis for a lot of the disallowances, was that Amron didn't provide the evidence necessary. If the Commission has authority to do this with gas, why did the legislature need to pass legislation requirement for electric distribution? Couldn't they just rely on the Commission to do that also? I believe that the fact that they included electric but they excluded gas seems to be intentional. Well, gas wasn't part of CJEA. I guess it's really the most fundamental answer, Your Honor. So CJEA is a new piece of legislation that passed about three years ago. So the Climate? Yes, the Climate and Ecological Act. And requiring utilities to incorporate a lot of renewable energy, their entire rate structure changed, how the rates are calculated. There's been a lot of business before the Commission related to the new, they're now multi-year integrated grid plans, multi-year rate plans, and so the whole structure on the electrical side changed. What the Commission found in this case was that it didn't have, and it's important for the Court to understand that you heard testimony or argument from counsel about, well, you know, we've been doing this for years. We've been asking for these approvals. The stuff they've been doing for years was getting cost recovery under an automatic cost recovery mechanism known as the QIP Rider. And under the QIP Rider, they could just come in before, it was a reconciliation case. It was not a general Section 9201 case. And that's what this Court understood in Illinois Power, was that there are two ways that the Commission makes rates. One is a Section 9201 general rate case, where the Commission brings all of its expertise to bear and determines just and reasonable rates. As part of that analysis, in this case, the Commission needed to look at the prudency of its investment, of Ameren's investment. But that's very different than an automatic cost recovery rider, which is limited to a simple prudency review. And really, the question is answered looking at it this way. In a 9201 case, the utility is coming before the Commission and saying, hey, we want to spend X million dollars on distribution plan. And the Commission says why, and the utility gives the reasons why. And then the Commission evaluates whether there's evidence to support that. But then ultimately, it decides whether that's a just result, and that X million dollars results in a just and reasonable rate. So now you're getting into policy issues, and this is really a rate case. No, no, no. I'm sorry. To disagree respectfully, I disagree. No, no, no. It's not policy. It's application of the Public Utilities Act, Article 9, the Council talked about. Article 9, Section 9201 says all rates must be just and reasonable. Various other provisions of Article 9 allow a utility to come in and ask for recovery of specific costs under the rider. And that's what had been happening all these years ago. It had been repeatedly happening that the Council referenced. AMRN would come in and get into the QIP statute for just a second. About 10 years ago, the General Assembly passed the QIP statute to encourage utilities to upgrade their systems. For the last several years, that's what AMRN has done. It replaced lots and lots of the dangerous pipe that was on its system. The AG witness said you've really taken care of that through this QIP and the reconciliation process in past years. Now we're in the general rate case, and we have to look at this. In prudency, although it's part of this general rate case under Section 9211, the statute reads that the costs incurred must be reasonable. That's different. It's a forward-looking. The Commission is looking at do these costs result in a reasonable rate. But didn't the Harrisonville case indicate that that was beyond the Commission's authority to look at that? No, Your Honor. The Harrison case dealt with, at that time, the Commission's declaration of how a utility had to comply in future rate cases in obtaining easements. That was really related to one of the arguments in support of the long-term infrastructure plan. But that's really on a different issue. I would really point the Court, in terms of how these statutes interact, to the Illinois Power case from this Court, where it very crudely articulated that, and the Commission reiterated that in its standard when it said, you've got to look at both. We have to look at the prudency of these costs, but we also have to ultimately result in a just and reasonable rate. So back to the point about the difference between a reconciliation case and prudency. In a cost recovery reconciliation process, where the Commission is after the fact looking back and saying, did the utility spend this money prudently? I see my time is up. May I finish with the answer? Did the utility spend this money prudently? It can't use hindsight and go back and say, well, we would have done something different. The utility arguably made a prudent decision. It spent that money on plant additions or other recoverable items, and then came to the Commission and said, now we need to recover that cost. Please allow us to charge that back to the customers. That's a very different analysis than a Section 9201 case, general rate case that we have pending now, where the utility says, we want to spend X million dollars in the future on something. Can we do it? We think it's prudent. And the Commission says, no, we've looked at all your evidence. There is no identified safety risk. These are general allegations of safety and reliability. There is nothing specific. You've done all of this work for the past 10 years under the QIP statute to replace hundreds of millions of dollars of your infrastructure. We're going to let you keep doing it, but not at the pace that you did it before. Thank you, Your Honor. I have a question if I may. We touched on the Harrison case. Yes. And you said that was related to the plan that was ordered, the long-term infrastructure plan. Yes, Your Honor. And you heard counsel argue that, look, that plan is for future plans, and how is that related to rates as they occur now? Can you tie those two together for me, please? She actually, I think, said they would impact future rate cases, and that's not really quite accurate. What the Commission found is that it would be useful to have that information in determining in future rate cases the prudency of the utility's investments in order to come to the conclusion of a just and reasonable rate. And certainly under the statutes that we've cited in our brief and the statute to give the Commission plenary authority over utilities with respect to the regulation and requiring them to produce information and reports, we can ask them under the statutes to produce information pursuant to reports. But the statutes that were cited, I believe I'm looking at page 43 of the response brief, isn't that related to existing reports rather than ordering them to prepare a report? Is that an overreach? I don't think it's an overreach. Fundamentally, the function of the Commission is to get the information necessary so that it can exercise its business judgment and balance, right? That's really what we're doing in Section 9201 cases. The Commission is balancing the interests of the utility against the cost to the rate payers. And all the Commission did in this case was ask for information. And they didn't give them, AMR did not give the Commission the type of information it felt was necessary in this case. That's why it found that it hadn't proved its case. And it's trying to avoid that in the future under the authority, under its plenary authority and certainly some of the specific authority that's identified in our brief with respect to the Statutes 5-101 and the others. Other questions, Justice McKenna? Justice Shulman? I'm sure we've asked you questions all day, but given our limited time. It's a dense record, as Your Honor suggested. Yes, it is. Thank you. Thank you. Ms. Mitchell-Rebell? Thank you. Justice Vaughn, I wanted to begin with the question that I said I would follow up with as it regards verification on eligibility to continue to participate in the low-income credit program. There is the eligibility that's validated through the community agencies for customers who have LIHEAP or PIP, which are state-run programs associated with credits. But the Commission also adopted, and this is in the Appendix 278, the AG's recommendations for customers to self-report for Tier 5 eligibility, which was the additional layer of eligibility that the Commission adopted, and that the company would annually audit customers that were enrolled in that level of discount for eligibility. So I did want to just close the loop on that. I would like to start with counsel's discussion on the prudency distinction that the Commission has tried to draw between a rate case and a qualifying infrastructure plant or QIP right or reconciliation. It's a distinction without a difference. The language is prudency. 9201, excuse me, 9211 of the Act says that the only rate base that may be part of a utility's rates is that which is prudently incurred. The QIP tariff statute also says that qualifying investments must be prudently incurred. It's the same standard. They're both rate-setting cases. So there is no distinction as far as what the Commission needs to do in investigating and looking at the prudency of the projects. The problem here is that the Commission did not – the Commission gave lip service to the prudent standard, but it didn't actually apply it because it didn't look at any individual projects. They just said, you're spending too much. As counsel acknowledged, the Commission said that the pace was too much. Slow down. But that's not the prudent standard. There isn't an ability under the Illinois Power case recognizing that prudence is not – there can be differences of opinion about what prudent actions may be, but that does not render the company's approach to investments. But what about this notion that Ameren did not present enough information? I mean, it really begs the question that they ordered this long-term infrastructure plan. They clearly wanted more information. So what about that argument? Your Honor, we submit that Ameren submitted to the Commission the same kind of evidence that it had always submitted in a rate case. The Commission has minimum filing requirements that are found in Title 83 of the Illinois Administrative Code, Part 285. And among those requirements for gas utilities is certain information associated with plant additions, plant additions being these pipeline investments. And the company provided the same kind of evidence that it had provided both in rate cases and in qualifying infrastructure plant cases to address prudence, and the Commission had found those to be appropriate as far as the level of evidence to support those investments. And what counsel for the Commission did not address in the briefs and is fairly striking is that the Commission staff's own engineering expert looked at that evidence and found it to be sufficient to find those investments to be prudent. I will just touch on the long-term infrastructure plan again. The Harrisonville case said that addressing something that should impact or influence or weigh on a future case not yet filed was gratuitous. And that's what the long-term infrastructure plan requirement here is. It's gratuitous and it does not bear on the Commission's decision in the 9201 proceeding that was before it. Counsel refers to various provisions of the Act. Those were also in the briefs. But at what point does that authority stop? As I mentioned, this long-term infrastructure plan requirement will go on in perpetuity, presumably. There is no end date. But again, it had nothing to do and was gratuitous as it related to the Commission's decision for 2024, which were the costs at issue. Do you want to comment on the – I think we touched on it a little bit in your initial argument, but this idea with the electric – there's a plan that's actually required for electric companies but not for gas distribution, but the Commission says, well, we have that authority anyway. I mean, it seems like if the legislature picks one thing and excludes another, it seems like the legislature has spoken on that. How do you respond to opposing counsel's argument that that's still included in their overall authority? Absolutely. The CJA, as counsel acknowledged, is very prescriptive about the types of things that electric utilities must do to address long-term planning. And there is nothing in that law about what it can do as it relates to gas utilities. And if the legislature said, we need to detail pages – the CJA, the Climate and Equitable Jobs Act, is nearly 1,000 pages long, includes lots of detail. There's nothing about the gas utilities. And so if there was such a force to drive towards the electric utilities providing these kinds of plans, the absence of anything with respect to gas utility plans of the same kind is striking and should not be the other provisions of the Public Utilities Act that were not at issue. Again, they're in Articles 5 and Articles 8 of the Public Utilities Act, which don't directly bear on a rate case proceeding under Article 9, shouldn't be relied on to extend what the General Assembly declined to do. Thank you. Questions, Justice McCain? Mr. Shulman? Thank you for your arguments.  Appreciate your arguments today. We'll consider the arguments you made in your brief and supporting record. And the arguments you made today, we will take them out under advisement and issue a decision in due course.